JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal and cross appeal from a judgment by Domestic Relations Judge Anthony J. Russo that adopted and modified, in part, the recommendations of Magistrate John R. Homolak on issues of child support, attorney fees, sanctions, and contempt. Plaintiff-appellant Pnina Glassman, fka Offenberg, asserts that appellee/cross appellant Nathan Offenberg's self-generated income for purposes of child support computation was improperly and arbitrarily determined, awards for attorney fees were arbitrarily low, her motions for Civ.R. 37 sanctions were wrongfully denied, her motions for contempt and judgment against Offenberg's new wife, Esther, should have been granted, and Offenberg should not have been given a credit for asserted child support overpayments and travel expenses.
 {¶ 2} Offenberg, in his cross-appeal, claims that the computation of his self-generated income was arbitrarily high, that it was error to grant Glassman attorney's fees and show-cause motions, that to order him to serve a thirty day jail sentence for contempt of court or purge the sentence by satisfying certain arrearages was improper, and that his post-order motion for a new trial should have been granted. We affirm in part, reverse in part and remand.
 {¶ 3} From the record we glean the following: The couple were divorced in 1988. In October of 1994, Mrs. Glassman moved to show cause and for attorneys fees when Mid-America Steel Corp. ("Mid-America"), Offenberg's former employer, failed to release to her $36,000 in support arrearages as ordered by the judge; and, in September 1995, she filed additional motions to show cause, for attorney fees and for sanctions. In October of 1995, Offenberg moved for a reduction in child support for their three daughters. Thereafter, the parties filed sundry motions involving modification of child support, seeking sanctions, a temporary restraining order, overpayment/credit, and to exclude evidence. Twenty-six days of testimony between January 9, 1996 and July 23, 1997, document the epic battle that ensued.
 {¶ 4} In 1992, Offenberg created Phone S.S., Inc. ("PSS"), a Subchapter S corporation through which he engages in sales, training, and consulting for steel sales-related businesses under various names, including PSS, Inc., C N Steel and Phone Sales Specialists (collectively, "PSS"). Mrs. Offenberg owns the corporation and also operates Rana Cosmetics, a cosmetics retail business, using the federal tax-ID number of PSS. In various documents Offenberg claims to be either the president or secretary of PSS, and his businesses are responsible for all but a tiny fraction of PSS's revenues; the company reported gross sales in excess of $805,000 for tax year 1995, and had over $1,123,000 in 1996. Mrs. Offenberg's role appears limited to running Rana Cosmetics, a rather small concern, and depositing Offenberg's clients' checks into corporate accounts.
 {¶ 5} Mrs. Glassman alleged that the Offenbergs had conspired to transfer the bulk of the earnings of these various enterprises to PSS, as opposed to Offenberg, individually, in an effort to hide income from her for child support computation purposes, and illegally deducted, from its gross revenues, various trips and other personal expenses as "business expenses." Moreover, she claimed, in an effort to keep funds from her reach, they had transferred large sums of money to relatives in the United States and Israel.
 {¶ 6} When presented with discovery requests about the finances of PSS, Offenberg initially provided little information under the excuse that all documents relating to the company were in the possession of his wife. During a 1995 deposition he denied knowledge about almost anything related to PSS and invited Mrs. Glassman to "spend some more money and find out" the information she requested. To support his assertion that he earned approximately $33,800 annually as a salesman and consultant, he produced thirteen pages of illegible or otherwise unhelpful copies of W-2 forms and documents and, while alluding to the fact that his accountant may have some information regarding the earnings of PSS, inexplicably could not remember his accountant's name. He asserted that Mrs. Offenberg was the owner of PSS, and that she was in control of the company's operations and financial records. Before the magistrate, however, Offenberg admitted that he misrepresented or fabricated much testimony at his deposition because he was upset with Mrs. Glassman and resented her lawyer's threat to provoke an Internal Revenue Service audit on him and PSS.
 {¶ 7} Mrs. Offenberg, added as a party because she could be a person having possession or control of property under Civ.R. 75, was ordered to appear for a deposition and failed to do so. When she was eventually deposed she produced approximately 5,600 pages of unorganized documents, bank statements and invoices relating to PSS. She claimed, both during her deposition and before the magistrate, she could not remember how approximately $458,000 found its way into several personal bank accounts or her investments between 1992 and 1996. Unless presented with a copy of a canceled check purporting to transfer the money, she either denied any knowledge or referred the question to her accountant, now identified as Arthur Good.
 {¶ 8} When asked about her personal bank accounts or finances, matters within her own knowledge, she hesitantly provided extremely limited information and, on questions about her finances and assets before she married Offenberg, either could recall nothing or stated that her finances were none of Mrs. Glassman's business.
 {¶ 9} As a result of the Offenbergs' conduct, Mrs. Glassman issued subpoenas to various banks for information about accounts controlled by the Offenbergs or PSS. The necessity for this method of discovery prolonged the proceedings and generated significant costs and fees; however, armed with this information, Mrs. Glassman presented evidence to the magistrate supporting her estimate that Offenberg's annual income was approximately $460,000 annually, based on earnings from January 1995 to February 1997.
 {¶ 10} Arthur Good, Offenberg's now identified accountant, testified at a hearing that he prepared Offenberg's and PSS's tax returns based entirely on check registers Offenberg gave him. While he stood behind his mathematical calculations resulting in his estimate of Offenberg's personal income between 1992 and 1996 as roughly $51,000 per year, he noted that he accepted at face value any representations Offenberg made to him about either personal or PSS income/revenues or business expense deductions. He testified that his entire knowledge of the revenues flowing into and out of any bank accounts controlled by either of the Offenbergs or PSS was limited to what each represented to him and, to determine the growth of an account, he reviewed only the first and last bank statements of a given year.
 {¶ 11} Another issue before the magistrate involved the disposition of $50,000 in a deferred compensation account Offenberg owned through a former employer, Mid-America. In 1994 the judge had ordered disbursement of $36,000 from the account to Mrs. Glassman in satisfaction of child-support arrearage and attorney's fees awarded to her from the 1988 divorce. She alleged that Offenberg delayed any disbursement of the account when he intentionally filed a Federal W-4 request with Mid-America to withhold, over and above the customary withholding taxes, an additional $18,000. In the interim, Robert Zashin, Offenberg's original divorce lawyer, attempted, unsuccessfully, to attach the Mid-America account as payment for some $32,000 in unpaid fees. Mrs. Glassman, as a party interested in the funds, incurred over $7,000 in legal fees to successfully defend the suit and Zashin's appeal, in which Offenberg did not participate.
 {¶ 12} In early 1996, the magistrate issued a temporary restraining order on Mrs. Offenberg's Ohio Savings Bank account containing approximately $44,000 which, Mrs. Glassman had alleged, contained PSS revenues. Although Mrs. Offenberg moved to dissolve the restraining order twice during the pendency of the proceedings, she was unsuccessful and no action was taken relative to the account by the time the parties filed their respective notices of appeal to this court.
 {¶ 13} After lengthy discovery disputes and resultant motions filed by Mrs. Glassman for sanctions and/or attorney's fees in connection with the Offenbergs' refusals to appear at deposition or adequately respond to written requests for discovery, and the periodic hearing dates between 1996 and 1997, the magistrate issued his decision on January 6, 1999. He found that Offenberg had misrepresented his true income and, presented an exhaustive summary of the financial information relating to bank accounts and PSS revenues compiled by Mrs. Glassman, and determined that for purposes of computing child support, $250,000 was a fair estimate of Offenberg's annual income.
 {¶ 14} The magistrate noted that, while Mrs. Offenberg owned PSS on paper, Offenberg maintained complete control of the entity, and concluded that, through his manipulation of PSS's corporate accounts and transfers of revenue to accounts controlled by his wife, Offenberg's personal income figures had been completely manufactured. He compared his 1989 and 1995 requests that his child support payments be reduced for inability to pay with his purported 1992 to 1996 income tax charitable deductions totaling $84,000; we note that Phone SS, Inc. reported charitable deductions of roughly $56,000 for the same tax years.
 {¶ 15} The magistrate proceeded to rule on the various motions to show cause, for attorney's fees and for sanctions filed by the parties in the course of the untoward and lengthy proceedings. He found that Offenberg had impeded the disbursement of the Mid-America fund to Mrs. Glassman, engaged in obstructive and unwarranted discovery tactics and failed to report to the Cuyahoga County Child Support Enforcement Agency ("CSEA") that PSS was his employer or income source and that these actions warranted the contempt of court. As a sanction, he recommended an order requiring Offenberg to serve thirty days jail time, with the option of purging the contempt finding by paying Mrs. Glassman the balance of the Mid-America funds due her and interest, for a total of $15,268.63. He also found that Offenberg's reluctance in providing discovery of PSS's financial information had caused Mrs. Glassman's lawyer to spend 160 hours tracking down this data, justifying an award of $24,000 in attorney's fees at the lawyer's customary rate of $150 per hour.
 {¶ 16} The magistrate declined to find Mrs. Offenberg to be in contempt for her conduct, reasoning that, while she was initially reluctant to comply with orders of court, she ultimately provided a large number of useful PSS records. Finally, he determined that Offenberg was entitled to a $13,848.10 credit against sums due based on a child support overpayment of $11,871 up to December 31, 1995, and reimbursement for $1,997 in travel expenses incurred so that the children could visit Offenberg from the Glassmans' St. Louis, Missouri home.[1]
 {¶ 17} The parties filed extensive objections to the magistrate's report and the judge adopted the recommendations with the following modifications: Finding that Offenberg testified he estimated the gross expenses of PSS at sixty percent of gross revenue, the judge, using the 1995 PSS tax return gross revenue figure of $805,730.67, determined Offenberg's annual income to be $322,292.27, reflecting forty percent of gross revenue and increased the amount of the child support payment and arrearage based on that finding. He also adjusted the attorney's fees due to Mrs. Glassman to be $37,500, instead of the $24,000 recommended by the magistrate, implicitly finding that the delays and extra effort caused by the Offenbergs' discovery obstruction caused Mrs. Glassman's lawyer to expend 250 hours, at $150 per hour, undertaking that discovery.
 {¶ 18} Mrs. Glassman, in Case No. #78885, and Offenberg, in Case No. 78886, filed notices of appeal to this court, and we remanded the case for a ruling on Offenberg's pending motion for a new trial and sanctions. The motion was denied in February of 2001, allowing the appeal to proceed. In Case No. 79425 and 79426, Mrs. Glassman and Offenberg re-perfected their appeals based on the February 28, 2001 ruling and we consolidated all four case numbers for disposition. Glassman appealed in seven assignments of error, and Offenberg appealed in five cross-assignments of error, discussed in turn, and grouped, where appropriate.
 {¶ 19} Both parties take issue with the finding that Offenberg's income, for purposes of computing his child support obligation, was $322,292.27, or forty percent of the $805,730.67 gross income of PSS, based upon its 1995 corporate tax return.
 {¶ 20} In computing income for child support purposes, where the parent derives income from a subchapter S corporation, a judge must examine the financial data of the corporation, taking into account the entity's revenues and expenses, to determine the true income received and that determination of child support will not be disturbed absent an abuse of discretion.
 {¶ 21} R.C. 3113.215(A),[2] which defines income for purposes of child support calculations, states in pertinent part:
 {¶ 22} "(1) `Income' means either of the following:
 {¶ 23} "(a) For a parent who is employed to full capacity, the gross income of the parent;
 {¶ 24} "(2) `Gross income' means, * * *, the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes, but is not limited to income from salaries, wages, * * *, and all other sources of income; * * * self-generated income; and potential cash flow from any source.
 {¶ 25} "(3) `Self-generated income' means gross receipts received by a parent from self-employment, proprietorship of a business, joint ownership of a partnership or closely held corporation, and rents minus ordinary and necessary expenses incurred by the parent in generating the gross receipts. `Self-generated income' includes expense reimbursements or in-kind payments received by a parent from self-employment, the operation of a business, or rents, including, but not limited to, company cars, free housing, reimbursed meals, and other benefits, if the reimbursements are significant and reduce personal living expenses."
 {¶ 26} A Subchapter S corporation does not pay a federal income tax.
 {¶ 27} "Rather, for federal tax purposes it is treated as a proprietorship or partnership and its annual earnings, whether distributed or not, are treated for tax purposes as if they are the personal earnings proportionately of the individual shareholders. The shareholders, therefore, pay federal income taxes on corporate earnings, rather than dividends, together with any other individual taxable income they may have. [If a party] is the sole shareholder, all corporate earnings or losses and applicable federal tax deductions, are treated for tax purposes as his personally, regardless of whether or not he has withdrawn the money represented by the corporate earnings."[3]
 {¶ 28} As stated by the court in Helfrich v. Helfrich,[4] the theory behind determining income for child support purposes is different from that of stating income for tax purposes:
 {¶ 29} "The legislature has specifically provided a definition of ordinary and necessary expenses to be applied when determining the amount of income available for child support. Further, the purposes underlying the Internal Revenue Code and the child support guidelines are vastly different. The tax code permits or denies deduction from gross income based on myriad economic and social policy concerns which have no bearing on child support. The child support guidelines, in contrast, are concerned solely with determining how much money is actually available for child support purposes. To this end, R.C. 3113.215(A)(2) includes nontaxable income in `gross income' for purposes of calculating child support. This recognized the economic reality that all money earned by a parent, irrespective of its taxability, is in fact income to that parent."[5]
 {¶ 30} It has been held that blind reliance on a corporate tax return for the income figure is an impermissible way to determine such income because it does not allow the judge to evaluate the possible manipulation of the numbers contained on the return to conceal income which, as a practical matter, may be available for child support purposes. Put another way, legitimate business expenses for income tax purposes may also be personal benefits for a parent, freeing up other income for possible child support distribution. "In computing income for purposes of child support, a court should pay particular attention to the possibility that a spouse who is the sole shareholder of a business is engaged in `creative accounting' designed to cloak net income. Therefore, the court needs to consider all financial data which relates to the operation of that spouse's business.[6] The failure to do so has been found to constitute an abuse of discretion."[7]
 {¶ 31} In order to properly determine the true income available to a parent who accumulates assets by producing self-generated income, R.C.3113.215(B)(5) states, in pertinent part:
 {¶ 32} "When a court computes the amount of child support required to be paid under a child support order * * *:
 {¶ 33} "(a) The parents shall verify current and past income and personal earnings with suitable documents, including, but not limited to, paystubs, employer statements, receipts and expense vouchers related to self-generated income, tax returns, and all supporting documentation and schedules for the tax returns."
 {¶ 34} Here Mrs. Glassman attempted to demonstrate Offenberg's true earnings by totaling all the money received by PSS business accounts and Mrs. Offenberg's bank accounts during the period from January 1995 to February 1997, disregarding revenues generated by Rana, the cosmetics business; subtracting out the costs of steel sold by PSS, indicated by the check registers Offenberg eventually provided in 1996, and; subtracting an estimate of Offenberg's PSS-related overhead business expenses based on figures for various largely undocumented or unverified expenses included in the 1995 PSS federal tax return. As a result of this attempt to construct an accurate picture of Offenberg's true earnings, Mrs. Glassman argued that, from January 1995 until February 1997, PSS produced $38,388 monthly for Offenberg in self-generated income, or $460,656 annually.
 {¶ 35} Offenberg countered that Mrs. Glassman's calculations were flawed and filled with duplications in terms of deposits to various bank accounts. He objected to her attempt to quantify his true income as a layman's unqualified attempt at a financial audit, derisively referring to the calculations as the "Glassman audit," and referring to the proceedings as a "witch hunt." Instead of attempting to provide the judge with his own version of what his self-generated income was, he simply directed the judge to the testimony of his accountant, Arthur Good, who estimated that Offenberg earned, from all sources, an average of about $51,742.54 per year between 1992 and 1996.
 {¶ 36} The magistrate, while discussing some of the gross revenues and expenses noted on the Offenberg and PSS federal tax returns and detailing revenues for various PSS ventures, ultimately fixed Offenberg's income, for child support purposes, at $250,000 annually without providing a connection to any analysis of Offenberg's share of PSS's gross revenues or any legitimate business expenses permitted by R.C. 3113.215. The magistrate's decision, therefore, arbitrarily assigned an unsupported income to Offenberg, and the judge was correct in refusing to adopt it.
 {¶ 37} Unfortunately, however, the judge also chose an arbitrary income amount to assign to Offenberg. In the final order, the judge ruled that, based upon Offenberg's estimate that sixty percent of PSS revenue constituted expenses, he fixed Offenberg's income at $322,292.27 for child support purposes, based on a forty percent profit formula.
 {¶ 38} First, we find no testimony in the record that PSS runs on a forty percent profit margin and, even if such testimony was present, this type of analysis ignores the fact that, under R.C.3113.215(A)(1)(a)(3), a Subchapter S corporation owner's gross revenues and "ordinary and necessary" expenses must be reviewed by the judge in some detail to prevent the "creative accounting" which may be present in the owner's representations of what gross revenues and expenses are. It is error for a judge to determine self-generated income of an owner of a Subchapter S corporation by placing blind reliance on corporate tax returns. "While a tax return is a proper reference point to aid in calculating a parent's gross income, it is not the sole determining factor of what constitutes a parent's `gross income' or `ordinary and necessary expenses.'"[8]
 {¶ 39} This case presents a clear example of why detailed review of actual financial records is needed when a judge determines a parent's self-generated income in computing child support obligations. While Offenberg largely deferred to his accountant, in answering questions as to his income and finances, Good stated that his estimation of Offenberg's income was based on unverified revenues, undocumented deductions and incomplete check registers provided to him by Offenberg. Accordingly, Offenberg's estimation of his income is clearly unreliable and open to the creative accounting R.C. 3113.215 was passed to guard against. On the other hand, Mrs. Glassman's estimation of Offenberg's income should be reviewed for completeness and accuracy, and no review or findings based on such a review was undertaken either by the magistrate or the judge. The assignment of error and cross-assignment have merit.
 {¶ 40} Next, Mrs. Glassman asserts it was error to fail to impose sanctions, under Civ.R. 37, on the Offenbergs for discovery obstruction and evasion and error not to find Mrs. Offenberg in contempt. Civ.R. 37(D) specifically addresses sanctions for failure to provide discovery:
 {¶ 41} "If a party * * * fails (1) to appear before the officer who is to take his deposition after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court in which the action is pending on motion and notice may make such orders in regard to the failure as are just, and among others it may take any action authorized under subsections (a), (b), and (c) of subdivision (B)(2) of this rule. In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court expressly finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."
 {¶ 42} Absent an express finding that the failure to comply was substantially justified or that other circumstances would make an award unjust, a judge must grant a party's request for reasonable expenses.[9]
 {¶ 43} While the judge did properly determine that Mrs. Glassman was entitled to an appropriate amount of attorney's fees, as we so hold, infra, he ignored her request for costs associated with the litigation she undertook in this case. She alleged, and the judge agreed, that the attorney's fees requested were justified because of the Offenbergs' discovery abuses in either inadequately responding to discovery or failing to appear for deposition after being subpoenaed to appear. The refusal to award costs incident to these discovery failures directly conflicts with the judgment rendered and the explicit directive of Civ.R. 37(D), which mandates at a minimum, that a party responsible for discovery infractions must pay the reasonable expenses, including costs and attorney's fees, incurred as a result of the violations.
 {¶ 44} We find merit in Mrs. Glassman's two assignments of error, and direct upon remand a determination, and award, of costs attributable to the discovery misconduct of both Mr. and Mrs. Offenberg.
 {¶ 45} Next, Mrs. Glassman claims error in an inadequate award of her attorney fees and costs, while Offenberg claims the award was both arbitrary and made without any finding that he can pay it.
 {¶ 46} Under R.C. 3113.219(B), a judge, in modifying a support order, may order a party to pay the expenses of the other party, including attorney's fees, costs or court costs.[10] In awarding attorney's fees under this section, the judge is required to adhere to the requirements of Rule 21(B) of the Cuyahoga County Court of Common Pleas Domestic Relations Division (D.Loc.R. 21):
 {¶ 47} "At the time of the final hearing on the motion or pleading that gives rise to the request for attorney fees, the attorney seeking such fees shall present:
 {¶ 48} "(1) an itemized statement describing the services rendered, the time for such services, and the requested hourly rate for in-court time and out-of-court time;
 {¶ 49} "(2) testimony as to whether the case was complicated by any or all of the following:
 {¶ 50} "(a) new or unique issues of law:
 {¶ 51} "(b) difficulty in ascertaining or valuing the parties' assets;
 {¶ 52} "(c) problems with completing discovery;
 {¶ 53} "(d) any other factor necessitating extra time being spent on the case.
 {¶ 54} "(3) testimony regarding the attorney's years in practice and experience in domestic relations cases; and
 {¶ 55} "(4) evidence of the parties' respective income and expenses, if not otherwise disclosed during the hearing."[11]
 {¶ 56} At hearing, Mrs. Glassman's lawyer testified at length in support of the attorney's fees requested, the services he performed in pursuit of prosecuting her motions and obtaining discovery not supplied by Offenberg, and his qualifications as an experienced domestic relations litigator. He also submitted his fee bill to the magistrate as an admitted exhibit, which charged $74,856 in attorney's fees related to motions and issues now on appeal, $7,299 in attorney's fees related to the defense and appeal of the case attorney Zashin unsuccessfully filed to attach Offenberg's Mid-America deferred compensation fund and $11,166.94 in litigation expenses. The fee bill noted that the settlement the parties reached with Mid-America when the funds were actually distributed to Glassman included $14,250 for attorney's fees and/or expenses, so the total aggregate balance claimed was reduced to $79,071.54.
 {¶ 57} The magistrate justified the award of attorney fees to Mrs. Glassman by stating that he allocated 160 hours as the amount of time he thought reasonable to assume Glassman's attorneys spent compiling evidence that the Offenbergs should have provided. He also noted, according to the dictates of D.Loc.R. 21, that the issues in the case were enormously complex, the hourly rate charged by her attorney was commensurate with customary fees and the lawyer's experience as a domestic relations lawyer and that Offenberg's discovery evasion caused Mrs. Glassman to incur attorney's fees in conducting protracted discovery and significantly lengthened trial proceedings. The judge's increase in fees, from $24,000 to $37,500, was an adjustment for a larger number of hours he assigned as time Glassman's lawyer spent securing Offenberg's financial data, and the resulting increased trial time made necessary by the Offenbergs' discovery delays and informational incompleteness. The attorney's fees awarded by the judge, or 250 hours at $150 per hour, represented approximately half of the 499.04 hours of attorney's fees sought by Mrs. Glassman that were directly related to this case.[12]
 {¶ 58} Offenberg asserts the judge erred when he failed to find that he could pay the fees ordered and still provide for his daily necessaries. In light of the money being secreted or withheld by Offenberg, his cries of poverty in the face of $140,000 in personal and PSS charitable donations from 1992 to 1996 certainly ring hollow. Moreover, the cases cited in support of his position that the judge must explicitly state that an obligor has the ability to pay attorney's fees in order to lawfully assign them apply specifically to attorney's fees awarded as alimony,[13] and not to attorney's fees awarded because of discovery misconduct or contempt.
 {¶ 59} In any event, the magistrate did consider, under D.Loc.R. 21, the relative financial position and earning abilities of the parties, and this finding acknowledged both the rule that, in ordinary circumstances, a party should be responsible for its own attorney's fees,[14] and the fact that Mrs. Glassman does have significant property of her own and earning potential, considering her voluntary underemployment and the general affluence of the Glassman household.[15]
Because Offenberg caused attorney fees to be unnecessarily incurred, the findings overall also place an appropriate share of the attorney's fees on his shoulders.
 {¶ 60} We find no abuse of discretion in awarding $37,500 to Mrs. Glassman in attorney's fees, and the assignment of error and cross-assignment are not well taken.
 {¶ 61} Mrs. Glassman next asserts it was error not to render judgment against Mrs. Offenberg because the evidence demonstrated she colluded with her husband in concealing his income and diverting it to her. Mrs. Offenberg was added as a defendant under Civ.R. 75(B)(1), which authorizes joinder in divorce proceedings of:
 {¶ 62} "A person or corporation having possession of, control of, or claiming an interest in property, whether real, personal or mixed, out of which another seeks an award of spousal support or other support * * *."
 {¶ 63} The magistrate and the judge technically did not fail to render judgment against Mrs. Offenberg; actually, they made no finding at all, relative to either the $44,000 in restrained assets in her Ohio Savings Bank account or, given her demonstrated role in taking checks written to one of the PSS entities because of only Offenberg's labor and depositing them into either corporate or her personal accounts, relative to her involvement in her husband's efforts to minimize his self-generated income. From the evidence, Mrs. Offenberg improperly, at a minimum, controlled money belonging to PSS which otherwise should have been available for Offenberg's obligations to his children.
 {¶ 64} This assignment of error is sustained and the case remanded for a ruling on the issue of the extent of Mrs. Offenberg's involvement in the over-all circumstances of her husband's child-support obligations.
 {¶ 65} Mrs. Glassman next challenges the order granting Offenberg's motion to determine overpayment of his child support obligation in light of what she claims are his "unclean hands." Additionally, she claims it was an abuse of discretion to credit him with $13,848.10 in support and travel reimbursements.
 {¶ 66} R.C. 3105.011 states that a judge in a domestic relations action has "full equitable powers * * * appropriate to the determination of all domestic relations matters." An equitable defense can be raised against a statutory remedy and, therefore, the equitable doctrine of unclean hands can be employed, where appropriate, in a divorce action.[16] Equity requires that whenever a party takes the initiative to set in motion the judicial machinery to obtain some remedy but has violated good faith by his or her prior-related conduct, he will be denied the remedy.[17] To bar a party's claims, that party must be found to be at fault in relation to the other party and in relation to the transaction upon which the claims are based.[18]
 {¶ 67} "[E]quity refuses to lend its aid in any manner to one seeking its active interposition, who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeksrelief. * * * If the alleged wrongful conduct of the complainant `appears not to have injured, damaged, or prejudiced the defendant, the maxim may not be successfully invoked.'"[19]
 {¶ 68} Offenberg moved for a decrease of his child support obligations, effective October 25, 1995, and claimed overpayments in 1994 and 1995. Mrs. Glassman did not dispute the order assigning support obligations during that time frame; it was not until January 2, 1996, that she moved to modify child support. In addition, there is no dispute that the parties were to be equally responsible for the visitation-related travel expenses of their children. Accordingly, while Offenberg may have engaged in inequitable conduct by evading discovery as each party sought modification of child support, this conduct does not relate to his requested credit for overpayments he made under orders valid at the time the payments were made. His questionable conduct throughout the discovery evasion or frustration he may have caused did not relate to the relief he sought in seeking credits, and the "clean hands doctrine" is inapplicable.
 {¶ 69} Glassman also claims that Offenberg's credits amount to no more than $8,982.54 based upon her exhibit 291 and her impeachment of his exhibits J, K, and L but, unfortunately, none of these exhibits are in the record.
 {¶ 70} As stated in Shannon v. Shannon:[20]
 {¶ 71} "An appellant has the responsibility of providing the reviewing court with a record of the facts, testimony, and evidentiary matters which are necessary to support the appellant's assignments of error."
 {¶ 72} Mrs. Glassman would now require us to evaluate the trial transcript testimony, which only partially identifies or describes the content of the exhibits relied upon, for her argument that child support and travel reimbursements are overstated in the magistrate's decision. Without a complete and adequate record, we have nothing to pass upon and must presume the regularity of the proceedings and the presence of sufficient evidence to support the judge's decision.[21] These two assignments of error have no merit.
 {¶ 73} Offenberg claims it was error to grant Mrs. Glassman's motions to show cause, but we find no merit in his assignment of error. It is well-established that "the power of contempt is inherent in a court, such power being necessary to the exercise of judicial function * * *."[22] Civil contempt utilizes a sanction which is imposed to coerce the contemnor to comply with the court's order.[23] Proof of purposeful, willing or intentional violation of a court order is nota prerequisite to a finding of contempt.[24] "It is irrelevant that the transgressing party does not intend to violate the court order. If the dictates of the judicial decree are not followed, a contempt citation will result."[25] A person charged with contempt for violation of a court order may defend by proving it was not in his power to obey the order.[26] The party seeking to establish the defense of impossibility bares the burden of satisfying the court that his failure to obey was due to an inability to render obedience.[27]
A judge's ruling on a motion in contempt will not be disturbed on appeal absent an abuse of discretion.[28]
 {¶ 74} The magistrate granted four of Mrs. Glassman's motions to show cause, two of which dealt with Offenberg's actions in hindering the disbursement of the Mid-America funds to her. Offenberg contends he could not be found in contempt of any court order regarding those funds because Mid-America was ordered to disburse the funds and he violated no order. Mrs. Glassman had been awarded $36,000 from the Mid-America account in satisfaction of pre- and post-divorce decree arrearages, and Offenberg was obliged to pay all taxes associated with the account's disbursement. The judge found that the delay in Mid-America's release of the funds to Mrs. Glassman resulted, in part, when Offenberg wrongly filed a W-4 requesting an additional $18,000 in withholding tax for the fund and, Mid-America, unsure of its own tax liabilities given this request, held onto the funds. Because the magistrate found no value in Offenberg's testimony that he had been advised to file the W-4, and Ronald Simkoff, Mid-America's accountant, unambiguously testified that he neither prepared or directed Offenberg to prepare the W-4, the judge, in confirming that part of the decision, was justified in finding Offenberg in contempt for indirectly attempting to prevent collection by Mrs. Glassman. Additionally, since the tax consequences of the fund's disbursement were Offenberg's responsibility, and the magistrate found that he had the ability to pay the taxes but did not do so promptly to facilitate distribution, finding him in contempt of court was justified.
 {¶ 75} The magistrate also found merit in Mrs. Glassman's motion to show cause founded upon the discovery resistance and misrepresentation employed by Offenberg. While he is technically correct that he was unable to satisfy one magistrate's order requiring him to provide discovery requests five days before the specific order was journalized, the record and the magistrate's decision are replete with examples of his deliberate misrepresentations and frustration of the discovery process. The magistrate did not find Offenberg in contempt for failing to produce discovery by any specific date, only that the misconduct pervaded the proceedings. Offenberg's argument on appeal that he complied with the magistrate's orders and Mrs. Glassman's discovery requests to the best of his ability is simply, completely false. The magistrate was justified in finding him in contempt for his conduct in attempting to frustrate and prolong discovery.
 {¶ 76} The fourth show cause motion refers to an allegation by Mrs. Glassman that Offenberg, in violation of the divorce decree, failed to inform CSEA that he had changed employments in creating PSS and starting his own business. The magistrate found, contrary to Offenberg's assertions that he had complied, that Offenberg only sent a letter to CSEA informing the agency of his employment relationship with PSS in 1996, rather than when the S-corporation was established in 1992, and that he had baselessly asserted at hearing that the letter was written in 1992. This motion to show cause was also properly granted. This cross-assignment of error has no merit.
 {¶ 77} In his next assignment of error, Offenberg claims that the purge order connected to his contempt sentence was clearly punitive and excessive, and an abuse of discretion. Under civil contempt, prison sentences are conditional, i.e., the contemnor is imprisoned until he obeys the court order.[29] "If sanctions are primarily designed to benefit the complainant through remedial or coercive means, then the contempt proceeding is civil."[30] Punishment imposed upon an adjudication of civil contempt must afford the contemnor an opportunity to purge himself of contempt.[31] "The contemnor is said to carry the keys of his prison in his own pocket * * * since he will be freed if he agrees to do as so ordered."[32] In contempt proceedings, great reliance should be placed upon the discretion of the judge both in his findings of contempt and in the penalty imposed.[33]
 {¶ 78} Here, Offenberg argues that the judge's order was both punitive and excessive because he could only purge his thirty day jail sentence for contempt upon payment of $15,268.88 and, not having the ability to pay it, consequently was given no real opportunity to purge the jail sentence. He provides us, however with no evidence in support of his purported financial hardship, in contrast to the finding of the judge about the potentially large amounts of money he or his wife possess or control on behalf of PSS. The purge order sanction was directly related to his contempt in impeding disbursement of the Mid-America fund, and was clearly directed toward compelling Offenberg to obey the 1994 order to finally satisfy his, and not Mid-America's, arrearages. In addition, as we held above, Offenberg was found in contempt of court for disregarding the various orders directing him to submit appropriate discovery responses and the judge's standing order, stemming from the divorce decree, that he notify CSEA of any change of employment. We find no abuse of discretion and no merit in this cross-assignment of error.
 {¶ 79} Finally, Offenberg submits that he should have been granted a new trial, because the decision assigning his income as forty percent of PSS's gross revenue was against the manifest weight of the evidence. In line with our disposition of the first assignment and cross-assignment of error, this issue on appeal is moot, since this case is remanded for re-determination of Offenberg's income for child support purposes according to R.C. 3113.215.
 {¶ 80} In conclusion, we reverse and remand for a re-determination of Offenberg's self-generated income for child support services, uphold the judge's award of attorney's fees but reverse for a determination of the amount of costs to be awarded to Mrs. Glassman because of the Offenbergs' discovery evasion and hindrance, remand for a decision about the extent and nature of Mrs. Offenberg's participation with Offenberg that resulted in the child support arrearages, costs or attorney's fees determined to be owed by Offenberg, affirm the award of child support overpayments for the period prior to Offenberg's filing of his motion to modify support and of travel expense credits, and affirm the decision holding Offenberg in contempt and its accompanying purge order.
Judgment affirmed in part, reversed in part and remanded.
It is ordered that appellant and appellee share the costs herein taxed.
The court finds that there were reasonable ground for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas, Domestic Relations Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, J., CONCURS IN JUDGMENT ONLY TIMOTHY E. McMONAGLE, A.J., CONCURS.
[1] Pursuant to court order dated June 1, 1993, Glassman and Offenberg were to evenly divide the children's travel expenses, for the purposes of visitation.
[2] While we note that child support computation is currently governed by R.C. Chapter 3119, R.C. 3113.215 was in effect during the time of the various proceedings below, and we address these assignments of error under the earlier code section.
[3] Marcus v. Marcus (July 30, 1999), Greene App. No. 98 CA 83, citing Harter v. Harter (Feb. 26, 1998), Allen App. No. 1-97-55.
[4] (Sept. 17, 1996), Franklin App. No. 95APF12-1599.
[5] Id., see also Marcus v. Marcus (July 30, 1999), Greene App. No. 98 CA 83.
[6] See Bowen v. Thomas (1995), 102 Ohio App.3d 196, 201, Sizemore v.Sizemore (1991), 77 Ohio App.3d 733, 739.
[7] Corrigan v. Corrigan (May 13, 1999), Cuyahoga App. Nos. 74088, 74094. (Internal citation omitted)
[8] Houts v. Houts (1995), 99 Ohio App.3d 701, 706.
[9] Soloman v. Excel Marketing, Inc. (1996), 114 Ohio App.3d 20, 29,Bobko v. Sagen (1989), 61 Ohio App.3d 397, 413, Babb v. Ford Motor Co.
(1987), 41 Ohio App.3d 174, 180.
[10] We note that R.C. 3113.219 was amended and renumbered as R.C.3123.17 in 2001, but the amendment to the statute does not apply for our purposes, and there is no dispute that R.C. 3113.219 applies to the case sub judice.
[11] See, e.g., Roth v. Schildhouse (May 11, 2000), Cuyahoga App. No. 75617.
[12] The judge adopted the magistrate's finding that his award was based on ignoring attorney's fees claimed by Glassman which represented the fees expended to successfully defend the Mid America Fund attachment suit filed by Robert Zashin. That case was clearly a separate proceeding; should Glassman have desired attorney's fees in that case, those proceedings were clearly the proper forum in which to assert such a right.
[13] E.g., McCoy v. McCoy (1993), 91 Ohio App.3d 570, Swanson v.Swanson (1976), 48 Ohio App.2d 85.
[14] Farley v. Farley (1994), 97 Ohio App.3d 351, 358.
[15] The magistrate found that Glassman, a college graduate, had not been gainfully employed since 1978, and that she and her husband maintained an exceptionally comfortable lifestyle for themselves and the children.
[16] Safranek v. Safranek, Cuyahoga App. No. 80413, 2002-Ohio-5066.
[17] Marinaro v. Major Indoor Soccer League (1991), 81 Ohio App.3d 42,45, 610 N.E.2d 450.
[18] Trott v. Trott (Mar. 14, 2002), Franklin App. No. 01AP-852, 2002-Ohio-1077.
[19] Shampton v. City of Springboro (Nov. 13, 2001), Warren App. No. CA2000-08-080, CA2000-09-081.
[20] (1997), 122 Ohio App.3d 346, 349.
[21] Knapp v. Edwards Laboratories (1980), 61 Ohio St.2d 197, 199;Wells v. Spirit Fabricating, Ltd. (1996), 113 Ohio App.3d 282,288-289.
[22] DeNovchek v. Board of Trumbull Comm. (1988), 36 Ohio St.3d 14,15.
[23] ConTex Inc. v. Consolidated Technologies, Inc. (1988),40 Ohio App.3d 94.
[24] Pugh v. Pugh (1984), 15 Ohio St.3d 136, 140.
[25] Pedone v. Pedone (1983), 11 Ohio App.3d 164, 165. See, also,Windham Bank v. Tomaszczyk (1971), 27 Ohio St.2d 55, McComb v.Jacksonville Paper Co. (1949), 336 U.S. 187.
[26] Pugh v. Pugh (1984), 15 Ohio St.3d 136, 140, 472 N.E.2d 1085.
[27] In re: Purola (1991), 73 Ohio App.3d 306, 313-314 (Internal citation omitted).
[28] Pingue v. Pingue (Nov. 6, 1995), Delaware App. No. 95-20-06, Smithv. Smith (Mar. 3, 1997), Stark App. No. 96-CA-0285.
[29] Brown v. Executive 200, Inc. (1980), 64 Ohio St.2d 250, 253.
[30] Denovchek v. Bd. of Trumbull Cty. Comm'rs. (1988), 36 Ohio St.3d 14,16.
[31] Fry v. Fry (1989), 64 Ohio App.3d 519, 523.
[32] Brown v. Executive 200, Inc., supra, 64 Ohio St.2d at 253.
[33] Arthur Young Co. v. Kelly (1990), 68 Ohio App.3d 287,294.